UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CR-67-F

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| | ) | |
| CHARLES RONALD LOCKLEAR, | ) | |
| Defendant. | ) | |

This matter is before the court on the Motion to Suppress [DE-19] filed by Defendant Charles Ronald Locklear ("Locklear"). The Government has filed a Response [DE-21] in opposition. A hearing was held for this matter on January 5, 2012. Upon consideration of the evidence presented and the arguments advanced by both sides, Locklear's Motion to Suppress [DE-19] is **DENIED**.

## I. RELEVANT PROCEDURAL HISTORY

On May 24, 2011, Locklear was charged in an Indictment [DE-1] with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The charge alleges that Locklear, having been previously convicted of a crime punishable by more than one year in custody, knowingly possessed a firearm on October 2, 2010. On August 19, 2011, Locklear filed the instant Motion to Suppress [DE-19] claiming that the "invasion and search of his property, seizure of his person, and subsequent search of his person and home, was performed in violation of the Fourth Amendment to the United States Constitution" as the seizure and subsequent search lacked probable cause and the recognized exceptions to the warrantless search and seizure did not apply in this case. The Government has responded by arguing that the police officer's actions were

appropriate as he had probable cause to detain Locklear and to seize the rifle based on a totality of the circumstances. Furthermore, based on exigent circumstances, the officer was justified in detaining Locklear and seizing the rifle without a warrant.

## II. FACTUAL BACKGROUND

The court's findings of fact[1] are set forth as follows: On the morning of October 2, 2010, it appears that a caller, through a 911 call, indicated that a shooting had been going on and that there were "people that needed to be picked up because they had warrants and felonies." The caller also stated that there was a shooting "a while ago." The caller identified three individuals who were involved, one being Locklear. The caller stated that one individual was on the porch and two men were laying down. It appears that the caller did not identify herself, but claimed that her daughter was inside the house where the men were.

The police officer testified that he arrived near the location of Locklear's address "within five minutes." When he arrived, the police officer contends that he was "flagged" by two women.[2] One of the women stated that there was a man on the porch with a gun, that he had been up and down the road with it, and that the man had a felony. The police officer pulled to the right of the truck[3] parked in the front yard and was able to confirm that Locklear was in possession of a gun. The police officer, at this moment, gave commands to Locklear to put down the gun, drew his service pistol,

---

[1] An evidentiary hearing was held on this matter on January 5, 2011. The facts that the court has taken into consideration for this ruling was uncontested and the court has no reason to doubt the veracity of these contentions.

[2] Locklear claims that the woman who identified him and corroborated the 911 phone call suffered from Alzheimer's disease and lied about her true identity. It appears that this information was unknown at the time in which the police officer encountered this woman. The Government contends that the woman hid her true identity in fear of retaliation.

[3] It appears that the truck, depending on the angle, may have partially blocked the view of Locklear's front porch.

and directed Locklear to place his hands on the front door. Approximately within three minutes, the police officer was able to confirm that Locklear was a convicted felon. At this point, Locker was arrested and placed into custody.[4] Locklear, through this instant motion, claims that "the invasion and search of his property, seizure of his person, and subsequent search of his person and home, was performed in violation of the Fourth Amendment to the United States Constitution, and therefore, should be suppressed."[5]

## III. DISCUSSION

The Fourth Amendment provides that the "right of people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In order to have standing to challenge the admissibility of evidence allegedly seized in violation of the Fourth Amendment, the defendant must have "a reasonable expectation of privacy in the area searched, not merely in the items found." *United States v. Horowitz*, 806 F.2d 1222, 1224 (4th Cir. 1986) (citation omitted). In assessing the reasonable expectation of privacy, the court must determine whether the defendant manifested a subjective expectation of privacy in the place and that such expectation is deemed reasonable in the eyes of society. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see also California v. Ciraolo*, 476 U.S. 207, 211 (1986). As noted by the Supreme Court, not every observation made by a police officer constitutes a search within the

---

[4] Locklear claims that he communicated to the police officer that he was in possession of the rifle only because he took the firearm from his drunken brother to keep him from shooting a next-door neighbor after a recent altercation. Locklear further claims that if he did not keep possession of the firearm, a deadly fight would have likely ensued.

[5] The court, in an attempt to clarify Locklear's contention, asked exactly what evidence he is seeking to suppress. He claimed that he wanted to suppress the gun as evidence. The court asked the police officer to explain the exact scope of the contested search and seizure. The police officer responded that the inside of the house was never searched and he entered the front porch of the residence to detain Locklear and seize the gun.

3

meaning of the Fourth Amendment, even if the intended purpose is to determine the existence of criminal activity. *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983). If the inspection by the police officer does not intrude upon a legitimate expectation of privacy, there is no "search." *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (stating that a " 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed"); *Andreas*, 463 U.S. at 771 (1983). The burden is placed on the defendant to establish, based upon the totality of the circumstances, that the "search or seizure violated his legitimate expectation of privacy in a particular place." *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

Searches and seizures, without a warrant, inside an individual's home are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). The sanctity of private dwellings is typically afforded the most stringent Fourth Amendment protection. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976). The curtilage is "an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. *Ciraolo*, 476 U.S. at 212-13 (1986); *see also Oliver v. United States*, 466 U.S. 170, 180 (1984) (stating that curtilage is the "area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' "). The protection bestowed by the Fourth Amendment, however, does not extend to the "open fields." *Hester v. United States*, 265 U.S. 57, 59 (1924). In addition, "[w]hat a person knowingly exposes to the public, even in his own home..., is not a subject of Fourth Amendment protection." *Ciraolo*, 476 U.S. at 213 (1986). Therefore, the police officer's " 'observations from a public vantage point where he has a right to be' and from which the activities or objects he observes are 'clearly visible' do not constitute a search within the meaning of the Fourth Amendment." *United States v. Taylor*, 90 F.3d 903, 908 (4th Cir. 1996) (citation omitted).

4

Here, the court finds that Locklear did not manifest a reasonable expectation of privacy when he visibly possessed a gun while sitting on the front porch of his house. It appears that the front yard of Locklear's residence is not surrounded by any physical barriers, such as fences, nor are there signs such as "No Trespassing" or "Private Property" which would indicate some reasonable expectation of privacy. The front porch was also not enclosed with any impediments that would either block its view nor would preclude the casual visitor from entering the area. In fact, a visitor would have to enter the front porch to even arrive at the front entrance of Locklear's home. Ultimately, the front yard and the front porch was as open to the police officer as to any delivery person, guest, other members of the neighborhood, or the general public and no evidence has been provided to contrary. As Locklear was in an area that was open and exposed to public view, it appears that he lacked the requisite reasonable expectation of privacy to trigger the protection of the Fourth Amendment.[6] Accordingly, the court finds that the police officer's action of entering Locklear's front yard and front porch did not amount to a "search" as contemplated by the Fourth Amendment.

Having concluded such finding, the court now examines whether the actions of the police officer in briefly detaining Locklear and seizing the gun was appropriate under the circumstances. Here, again, it appears that the police officer's action did not amount to a full-fledged search that

---

[6] Courts in other jurisdictions have concluded that, irrespective of whether it is curtilage, there is generally either no reasonable expectation of privacy or at least a reduced expectation of privacy in a front porch. See *Murphy v. Gardner*, 413 F.Supp.2d 1156, 1167-68 (D. Colo. 2006) (unenclosed front porch which contained homeowner's mailbox and newspaper rack did not constitute curtilage for Fourth Amendment purposes); *State v. Deary*, 753 So.2d 200, 201 (La. 2000) (stating that, while a front porch is curtilage, "[a] front porch does not necessarily enjoy the same measure of protection accorded [to] the home by the Fourth Amendment because of 'an almost implicit understanding and custom in this country that, in the absence of signs or warning[s], a residence may be approached and the occupants summoned to the door by knocking' ")(citation omitted); *State v. Johnson*, 793 A.2d 619, 629 (N.J. 2002) (upholding search of a front porch area because "the porch...although part of the curtilage, has a diminished expectation of privacy"); *Commonwealth v. Pietrass*, 467 N.E.2d 1368, 1373 (Mass. 1984) (states that "[i]f the porch were one that a visitor would naturally expect to pass through to gain access to the front door, then it would not be part of the 'curtilage' entitled to Fourth Amendment protection...On the other hand, if the porch door were the real front door of the house, the search would begin when the police stepped inside the porch").

would trigger the protections of the Fourth Amendment. Instead, it appears that the police officer's actions of briefly detaining Locklear and seizing the gun are in line with a investigatory stop.

The Fourth Amendment does not prohibit a police officer, "in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). In other words, police officers may temporarily stop and detain a citizen "where [the] police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30. If the officer believes that the suspect "may be armed and presently dangerous," the officer may frisk the person by patting his outer clothing "in an attempt to discover weapons which might be used to assault" the police officer. *Id.*

Moreover, to have reasonable suspicion based on an anonymous tip, the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). The crucial issue is whether the tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop. *See United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (recognizing that an anonymous 911 call conveying an emergency, together with the personal observations of police officers, can validate a warrantless search).

For the case at bar, the court finds that the police officer, at the very least, had adequate reasonable suspicion to justify his acts of briefly detaining Locklear and seizing the gun. As mentioned previously, the police officer arrived at a location near Locklear's home after being dispatched based on a 911 call which indicated a possible shooting and presence of firearms. The police officer's brief detention of Locklear and seizure of the gun, however, was not based on this

call alone. As the police officer arrived near Locklear's residence, he was flagged by two women, one who corroborated the information given by the 911 caller, namely identifying Locklear as a convicted felon and stating that he was in possession of a gun on the front porch of his house. The police officer also noted that the woman was "visible upset." The police officer then walked over to Locklear's house where he initially pulled behind a truck parked in the front yard. He subsequently looked over the truck to see if Locklear was in possession of the gun. At this point, the police officer was able to corroborate, again, that Locklear was indeed in possession of a firearm. Subsequently, the police officer directed Locklear to put his hands on the front door and relinquish possession of the gun for his safety and the safety others.[7] The police officer then seized the gun and within approximately three minutes, was able to confirm that Locklear was a convicted felon. The police officer then arrested Locklear and took him into custody. These facts, combined with the nature of the alleged crime - a potential shooting and possession of a firearm by a convicted felon - convince the court that under the totality of the circumstances, the police officer, at the very least, had reasonable suspicion to briefly detain Locklear and seize the gun. Accordingly, Locklear's Motion to Suppress [DE-19] is **DENIED**.

## IV. CONCLUSION

Based on the aforementioned rationale, Locklear's Motion to Suppress [DE-19] is DENIED. Locklear's arraignment and trial remains scheduled for the **January 17, 2012**, term of court in Wilmington, North Carolina.

---

[7] The fact that the police officer drew his service pistol does not convert an investigatory stop into an arrest. *See United States v. Vargas*, 369 F.3d 98, 102 (2nd Cir. 2004) (stating that under " 'ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop[,] intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.' ").

SO ORDERED.

This the 11th day of January, 2012.

/s/ James C. Fox
JAMES C. FOX
Senior United States District Judge